Raymond IVEN and Agnes P. Iven,
Plaintiffs in Error,

v.

Mary M. RODER, Henry W. Roder, John R. Roder, Elizabeth M. Roder, and Paul M. Roder, Defendants in Error.

No. 41384.

Supreme Court of Oklahoma.
June 20, 1967.

**322**

Murphy & Evans, Kingfisher, for plaintiffs in error.

John A. Ruth, Kingfisher, for defendants in error.

PER CURIAM.

This action was commenced in the District Court of Kingfisher County by the plaintiffs Mary M. Roder, et al, owners of 160 acres of land in that county, against the defendants Raymond Iven and Agnes P. Iven, husband and wife, the owners of 160 acres of land adjoining plaintiffs on the south. The parties will be referred to as in the trial court.

Plaintiffs contended that their land slopes from its east and west boundaries towards a natural water course approximately through the center of their 160 acre tract and then naturally to the south onto the land of the defendants. In 1908 the owners of the west half of the section, which included both tracts, joined with other landowners in the formation of a drainage district and constructed a channel along this natural water course through the center of plaintiffs' land. The district was dissolved in 1912, but the channel was used thereafter to dispose of surface water and continued to be so used for more than fifty years. In 1963 the defendants built earthen dykes or dams across the natural water course just south of their common boundary. This caused surface water to back up over plaintiffs' land. This action was for a mandatory injunction to require removal of these dykes.

The defendants in turn alleged that the plaintiffs had diverted water from its natural course by the ditching and leveling of low places and the draining of buffalo wallows, which had caused an unusual quantity of water to flow from the

plaintiffs' land and onto the land of the defendants and which they believed justified the construction of these dykes. The defendants in turn sought injunctive relief.

Trial of all the issues was to the Court and resulted in the entry of judgment against the defendants. The Court specifically found:

"(1) That on or about October 15, 1963, the defendant, Raymond Iven, built or caused to be constructed 3 earthen dykes or dams across natural waterways flowing from the land of the plaintiffs onto the land of the defendants.

"(2) That by reason of said dykes or dams being so constructed and obstructing the flow of the water, whenever there is any appreciable amount of rain the water which has been or would be impounded is spread out over and across the land of the plaintiffs.

"(3) That so long as said dykes or dams are permitted to remain, they cause damage to the plaintiffs' land and the plaintiffs do not have an adequate remedy at law for injuries caused by the construction of said dykes or dams."

The defendants' motion for a new trial was overruled, and they perfected their appeal to this court.

The defendants' first proposition is that the judgment of the trial court is contrary to the evidence and is not sustained by law. Their third proposition is related, and we believe is incidental, to their first proposition. For the most part, it is argued under the first proposition and is that the judgment of the trial court ignores the rule of equity that he who seeks equity must do equity and must come into court with clean hands, and the evidence shows that the plaintiffs drained more water onto the defendants' tract than would naturally drain thereon, thus giving the defendants the right to protect their property by casting back upon the plaintiffs' land that water which was in excess of the natural flow of surface water therefrom.

Insofar as law is concerned, the defendants, as to these propositions, rely entirely upon the opinion of this court in the 1965 case of Lynn et al. v. Rainey et al., Okl., 400 P.2d 805, wherein it is held in the first, second and third paragraphs of the syllabus:

"The common law governing the *diversion* of surface water as adopted and applied in this State has been modified and restricted to this extent, namely, that a proprietor may divert the same, cast it back or pass it along to the next proprietor, *provided he does so without injury to such adjoining proprietor*. Under this rule no one is permitted to sacrifice his neighbor's property in order to protect his own.

"Equity will refuse to lend its aid in any manner to one seeking its active interposition who has been guilty of any unlawful or inequitable conduct in the matter with relation to which he seeks relief.

"When surface *waters* by natural drainage collect in a natural basin or depression upon the premises of a dominant tenement, and escape therefrom only by percolation or evaporation, forming thereby a lake or pond, permanent in its character, *the waters so collected and coming to rest* lose the character of surface water, and may not by artificial means, *other than that incident to the cultivation of the soil*, be drained to the damage of a servient tenement." (Emphasis supplied herein.)

They contend that originally the Roder tract was flat land with numerous "buffalo wallows" or depressions scattered over it which collected surface water that would escape therefrom only by percolation and evaporation, and that there was no natural drainage of any of the Roder tract; that originally there was no natural drainage across the Roder tract from north to south; that the only north-south drainage channel through the center of the Roder tract was man made and artificial, and was not constructed by the drainage district mentioned

in the plaintiffs' petition, but was constructed by the plaintiffs in 1963, at which time they also dug ditches between "buffalo wallows," and feeder ditches, to drain all of the "buffalo wallows" and all of the Roder tract into the artificial north-south ditch and onto the Iven tract, to the Ivens' damage, so that they would be justified in casting all of such water back upon the Roder tract; that if such ditches were there in 1963, the plaintiffs in 1963 widened and deepened them so that the water flowed faster in them and cast more water onto the Iven tract than otherwise would have flowed onto the Iven tract, so that they were justified in casting all of such excess water back upon the Roden tract.

While reserving their contention that the dams in question were not constructed across a natural watercourse, the defendants stipulated with the plaintiffs, at a pre-trial conference, that the dams in question were constructed by the defendants and that they impound water, causing the same to spread out over and across land of the plaintiffs. We construe this as a stipulation that the dams in question built by the defendants cause water to stand, more or less permanently, on land of the plaintiffs.

In order to clarify the picture somewhat, we note here that insofar as the defendants' evidence is concerned their complaint (and justification for building the dams in question) is that since 1957 when there is a hard rain more water has drained into the pond on their tract than ever before, causing water to back up from their pond into their farm yard and around their barns and even into their granary, which never happened before 1957; and that they blame this on three things: (a) plaintiffs' action in widening and deepening of the north-south drainage ditch through the approximate center of the Roder tract; and (b) plaintiffs' action in digging, widening and deepening of the feeder ditches between buffalo wallows and into such north-south drainage ditch; and (c) filled places in the grader ditches on both the north side and

the south side of the road on the section line between Sections 27 and 34, 19 N, 6 W.I.M., which forces some water that should drain east in those grader ditches, including some water that drains from the north end of the east half of the Roder tract into the south grader ditch of that road, to drain west and into such north-south drainage ditch.

We also note that the evidence did not indicate that any of the filled places in grader ditches, mentioned by the defendants and their witnesses, were adjacent to the Roder tract or that any of the plaintiffs had anything whatsoever to do with all of such fills. In fact, one of the defendants' witnesses testified that the fills he was talking about had been constructed by oil company people, the owner of the land just east of the Roder tract, and the owners of land across the road north of the Roder tract. Therefore, the evidence concerning those filled places and the results thereof will be disregarded hereinafter.

In an action of equitable cognizance, this court will examine the whole record and weigh the evidence, and will affirm the judgment of the trial court unless clearly against the weight of the evidence or contrary to law or established principles of equity. Bennett v. Grother, Okl., 280 P.2d 1015; Moral Insurance Co. v. Fechtel, Okl., 280 P.2d 716; Southard et al. v. MacDonald, Okl., 360 P.2d 940; A. A. Murphy, Inc. v. Banfield, Okl., 363 P.2d 942.

A number of witnesses testified for both parties, and several exhibits in the form of drawings, aerial and ordinary photographs were introduced into evidence. The most revealing pieces of evidence were aerial photographs taken in 1937, 1951 and 1957, from which a civil engineer and surveyor, W. F. Denner, was able to point out the location of the natural water course and drainage ditch through the approximate center of the plaintiffs' land running from the section line road on the north approximately 2,000 feet south and then turning southeast and onto the Iven farm

and into a pond on that farm. This witness was able to state from his personal knowledge, as well as from these exhibits, that this had been the direction of the flow of surface water from the Roder farm since 1937. Other witnesses provided corroborative testimony as to this condition and its existence for many years.

One of the defendants' witnesses testified that in 1945 or 1946 he had worked for the Roders on their place with a "motor patrol," cutting some ditches from one buffalo wallow to another.

Another witness for the defendants, who had been living on the tract across the road south of the Iven tract for forty-five years, testified that about fourteen or fifteen years ago he saw a motor patrol working in the north-south ditch on the Roder tract and in 1963 saw a farm tractor with a "fresno" working in the north-south ditch; that in the past five years the Roders had made the north-south ditch and some of the feeder ditches that run into it wider and, he "thinks," deeper, and he "thinks" more water goes into the Iven pond than before then; and that for two or three years before the Ivens built their dams, there was more water in the Iven pond than ten years before.

Another one of the defendants' witnesses, who had farmed the place across the road north of the Roder tract in 1918 and 1919, or in 1919 and 1920, and had been county commissioner from 1942 to 1946, but had not been in the vicinity for the past six or seven years, testified that at those times the culvert under that road was stopped up and no water could come through from the north grader ditch to the south grader ditch; that he doesn't know anything about any feeder ditches, just knows about the north-south ditch; that it used to be ten or twelve feet wide, but is twenty or twenty-five feet wide now, and he "thinks" it carries more water than it used to. He did not connect any of the plaintiffs with the cleaning out of the culvert mentioned by him.

Another witness for the defendants, who had been familiar with the two tracts for sixty-five years, since he was nine years old, and had worked and stayed on the Roder tract when he was sixteen years old, testified that at that time there was no north-south ditch through the Roder tract and rain didn't drain off the tract at all but just stayed there and soaked in, except that the buffalo wallows stayed full all the time.

Raymond Iven, one of the defendants, testified that he had been living on the Iven tract for twenty-five years and had lived across the road from it for several years before that; that in 1957 water got up in his machinery shed and stayed about two weeks and was eight or ten inches deep part of the time, and up into their farm lot (the plat, hereinafter mentioned, shows the Iven's buildings about 400 feet south and a little west of the west end of the pond on the Iven tract), and has got up into the machinery shed and farm lot several times since 1957; that water didn't use to stand up around their buildings; that in 1963 he saw the Roders "making ditches, or cleaning out ditches— feeder ditches," and saw them making one new ditch on their southwest forty; that water used to stand on the Roder place but hasn't for the last two or three years on account of the feeder ditches; and that in the last several years he has noticed a substantial change in the quantity and rate of flow of the water coming from the Roder tract—there is more now than before then.

On cross-examination, this defendant admitted that, as long as he can remember, the man-made drainage ditch through the center of the Roder tract has been there, and there has been a drainage ditch from near the east end of the Iven pond, draining southward to the south section-line road (which ditch he has cleaned out in recent years), and water has flowed into the Iven pond and when the pond got full would continue on south through that ditch across the Iven tract, and water on the Roder tract has drained in about the same direc-

tions as now and, at least since 1957, in about the same amounts as now; that some time prior to 1957 he cut a ditch along the west side of the Iven tract to drain water away from their buildings and into the west end of the Iven pond; that in 1957 their pond got full and backed up in that ditch; that when water backed up into their machinery shed and around their granary and barn in 1957, about two months before the aerial photograph of July 10, 1957, hereinabove referred to, had been made, there had been unusually heavy rains in that vicinity; and that all of the water that backed up into that west ditch did come from the Roder tract.

The defendants' witness who had been living across the road south of the Iven tract for forty-five years testified that at that time in 1957 there had been the most rain that he ever saw.

In their original brief, the defendants state that they were considerate when they built their dams in that they left a low place or "spillway" in one of them, so that the impounded water on the Roder tract can get no higher than such low place or spillway in that dam. The topographic portion of a plat introduced into evidence by the defendants shows a low place in the longer dam and shows the elevation thereof as 91.0 feet. It also shows the elevation of the bottom of the Iven pond, at a point about 100 feet south of the low place in that dam, as 97.9 feet (which is 5.5 feet lower than the 93.5-foot elevation in the bottom of the grader ditch at the north end of the north-south drainage ditch), and the elevation in the bottom of the wide part of the north-south drainage ditch, at a point on the Roder tract which is approximately eighty feet due north of the low place in the dam, as 89.7 feet. From that point northward the elevations indicated in the bottom of the north-south drainage ditch gradually increase to the 93.4 shown in the grader ditch at the north end of the north-south ditch. At a point about 600 feet north of the dam the elevation is shown as 90.8 feet (two-tenths of one foot, or 2.4 inches, lower

than the low place in the defendants' dam), and the next elevation shown north of that point, in the bottom of the north-south ditch, is approximately 1,400 feet north of the dam and is shown as 91.4 feet (four-tenths of one foot, or 4.8 inches, higher than the low place in the defendants' dam). As confirmed by the engineer who made the plat, this means that when the water gets just even with the low place in the dam it will be backed up in the north-south ditch almost half way to the north side of the Roder tract and will spread out to cover all land having a comparative elevation of 91.0 feet or less, and while the water is still in motion and actually flowing through the low place in the dam will be backed up in the ditch a little farther and will be spread out a little more.

From all of the evidence, it is reasonable to conclude that the man-made north-south ditch through the approximate center of the Roder tract, across which the defendants admit that they constructed the dams in question herein within twenty feet of where such ditch enters their land, was originally cut some time prior to 1925 and has been in existence since at least 1925, in a natural drainage course or channel, and did not and does not divert or alter the natural flow of surface water from the Roder tract onto the Iven tract, so that the defendants did construct the dams in question across a natural drainage course or channel; that none of the plaintiffs had anything to do with the original cutting of such north-south ditch; that except for a portion of the west half of the Roder tract that naturally drains directly into the pond on the north end of the west half of the Iven tract or that naturally drains west into the east grader ditch of the section-line road west of the two tracts involved herein and then south down that grader ditch and into the pond on the Iven tract, all of the Roder tract naturally drains, either directly or indirectly, into such north-south drainage course and ditch and into the pond on the Iven tract, and when that pond gets full the overflow naturally drains at the southeast

corner into a natural drainage course southward across the Iven tract and into the north grader ditch of the section-line road south of the Iven tract; that in the 1930's the occupant of the plaintiffs' tract commenced preparing for cultivation, and cultivating, the portions of the Roder tract which theretofore had been pasture; that what was done with reference to widening such north-south drainage ditch or sloping the sides thereof and with reference to cutting feeder ditches between buffalo wallows and into such north-south drainage ditch, and widening such feeder ditches or sloping the sides thereof and cleaning out and maintaining such feeder ditches and the north-south drainage ditch, was done entirely in connection with preparing for cultivation, and cultivating, the Roder tract and was done pursuant to good farming practices on flat land in accordance with the general custom in the community.

It also appears that if the defendants had any cause to complain about the plaintiffs' action in draining water out of the buffalo wallows on the Roder tract it was at the time that the feeder ditches were cut into various buffalo wallows to release therefrom any water then standing more or less permanently therein, because since that time any water draining from the site of a buffalo wallow without being released by a cut made at the time of the draining has been surface water following the natural drainage of the land, just as though that buffalo wallow had never existed and held water more or less permanently.

Furthermore, it is apparent from undisputed evidence that except for some work done in 1963, all of the work done on the plaintiffs' land with respect to widening the north-south drainage ditch or sloping the sides thereof was commenced in the 1930's, and all of the work with respect to cutting feeder ditches between buffalo wallows and into the north-south drainage ditch was done in the 1930's and in 1945 or 1946, with most of that work having been done in the 1930's. And, in this connection, we note that the work done in 1963 could not have

had anything to do with any additional water on the defendants' tract in 1957 or any other time prior to the doing of such work in 1963, and the defendants offered no evidence of any flooding of their land after the plaintiffs did such work in 1963 or of any flooding of their land prior to the latter part of April or the early part of May, 1957, when according to undisputed testimony and the admission of one of the defendants, there were unusually heavy rains in the area, including the two tracts involved herein, and water stood around some of their outbuildings for a week or so, and they offered no evidence that water stayed in any part of their farm yard for any length of time after any rain between that one in April or May of 1957 and the time they built the dams in question or of any appreciable damage to any of their land.

■ Especially in view of the testimony of one of the defendants on cross-examination that some time prior to 1957 he had cut a ditch along the west side of the Iven tract to drain water from their farm yard into the west end of their pond, and that at the time in 1957 complained of by the defendants, water was backed up into that ditch and all of the water that stood for a while in their farm yard did not come from the Roder tract into the Iven pond, we cannot say that the judgment of the trial court in favor of the plaintiffs is clearly against the weight of the evidence or contrary to law or the established principles of equity relied upon by the defendants, that he who seeks equity must do equity and must come into court with clean hands.

Neither the defendants' first proposition nor their third proposition can be sustained.

Under the above-mentioned stipulation and evidence, the dams built by the defendants have caused appreciable damage to the plaintiffs and unless removed will continue to cause appreciable damage to the plaintiffs. Therefore, we must deny the defendants' fourth proposition, that the judgment of the trial court violates the maxim "de minimis non curat lex."

The defendants also contend it was error for the court to admit into evidence the records of the old drainage district. These records show that the lands involved in this lawsuit were a part of a drainage district laid out in 1908. At that time a ditch was dug across a portion of the defendants' land in order to drain the primary watercourse or ditch into their pond. Evidence in regard to this drainage ditch was properly admitted by the trial court. It was relevant to consideration of the length of time that water had drained across the defendants' land and into the pond. Evidence is relevant if it legally tends to prove some matter in issue or tends to make a proposition in issue more or less probable, and if otherwise admissible should be considered. Globe & Rutgers Fire Ins. Co. v. Roysden, 208 Okl. 660, 258 P.2d 644; Chaney v. Lackey, 204 Okl. 398, 230 P.2d 720; and Price v. Rogers, 201 Okl. 678, 209 P.2d 683.

The trial judge viewed the premises, and we believe made a decision which was not against the clear weight of the evidence presented to him. The court had the right to reject the contentions of the defendants that conduct of the plaintiffs had increased the flow into the main drainage ditch in such volume that it gave rise to a right to dam the same and cast it back onto the plaintiffs.

This court on several occasions has discussed the relevant rights and duties of upper and lower land owners. Haskins v. Felder, Okl., 270 P.2d 960; Gregory v. Bogdanoff, Okl., 307 P.2d 841, and Lynn et al. v. Rainey, Okl., 400 P.2d 805. Approval is given in these cases to the "common enemy" doctrine as modified by the rule of reason. The common law governing the diversion of surface water as adopted in this state has been modified and restricted to permit each proprietor to divert the same, cast it back, or pass it along, provided he can do so without injury to an adjoining proprietor. Under this rule no one is permitted to sacrifice his neighbor's property in order to protect his own.

In the case at bar the trial court concluded that the defendants, in the construction of the dykes which turned back water onto these plaintiffs for the purpose of protecting their own land, had in effect put the plaintiffs in a position where they had no way to drain their farm when there was no real showing that these dykes were necessary to protect defendants, or that the flow of surface water across their land was an unreasonable burden.

We have examined the evidence in detail upon which the trial court based its determination. The trial court's findings are not against the clear weight of the evidence and the judgment is affirmed.

The Court acknowledges the services of Andrew Wilcoxen, who with the aid and counsel of Tom R. Mason and Russell Ruby, as Special Masters, prepared a preliminary advisory opinion. These attorneys had been recommended by the Oklahoma Bar Association and appointed by the Court. The Chief Justice then assigned the case to a Justice of this Court for review and study, after which, and upon consideration by the Court, the foregoing opinion was adopted.

All the Justices concur.