**Kenneth Don WITT and Bob Joyce Witt, Husband and Wife, Kenneth Edward Booth and Mary Jo Booth, Husband and Wife, Appellants,**

v.

**James MARTIN; Ellex Transportation, Inc., an Oklahoma corporation; and Excalibur Insurance Company, a Minnesota corporation, Appellees.**

**No. 56193.**

Court of Appeals of Oklahoma, Division No. 4.

May 24, 1983.

Rehearing Denied July 25, 1983.

Certiorari Denied Nov. 1, 1983.

Released for Publication by Order of the Court of Appeals Nov. 4, 1983.

Ben T. Lampkin, Larry A. Tawwater, Lampkin, Wolfe, McCaffrey & Tawwater, Oklahoma City, for appellants.

Kenneth R. Webster, Jim T. Priest, McKinney, Stringer & Webster, Oklahoma City, for appellees.

BRIGHTMIRE, Presiding Judge.

A fast traveling eighteen wheeler crashed into the rear of another one as it headed down the divided highway on a clear summer afternoon. The tractor of the rear-ending truck, owned by defendant Ellex Transportation, Inc., was demolished, and damage to the forward semitrailer truck cost $7,872.38 to repair. The two drivers occupying the leading truck brought this action to recover for personal injuries. Their employer, Lee Way Motor Freight, Inc., intervened seeking recovery of what it had paid out for property damage and workers' compensation.

Following a trial that lasted more than a week the jury returned a verdict finding that the active driver of the Lee Way truck, Kenneth Witt, was 35 percent at fault, that the resting driver of the Lee Way truck, Kenneth Booth, was not at fault; that neither plaintiff was entitled to any damages; and that the damage sustained by Lee Way was what it asked for—$42,495.70. Judgment was entered accordingly.

Plaintiffs and intervenor appealed from an order overruling their motion for a new trial. Ellex has since settled with Lee Way and dismissed its appeal. We hold reversible error permeated the trial and remand for a new one.

I

Shortly after noon on Monday, July 3, 1978, plaintiff Kenneth Witt was operating his rig in an eastbound lane of I-40 at about 50 m.p.h. approximately 70 miles west of Oklahoma City, Oklahoma, when, as we said, it was suddenly struck in the rear by a large Ellex semitrailer truck, roaring along at the rate of between 60 and 70 miles an hour according to the official accident report. The impact was sufficient to demolish the Ellex tractor, tear it loose from the mainframe, and injure its driver. The trooper who investigated the wreck found the point of impact to be in the center of the right eastbound lane and that the Ellex truck laid down 180 feet of skid marks, all after the impact. The officer found defendant Martin lying on the ground apparently hurt pretty badly. Martin identified himself as the driver of the Ellex truck. When asked how the accident happened, Martin said he did not remember anything. Later at the hospital the officer again asked Martin to relate whatever he knew about the accident and at trial quotes the driver as saying, "I don't know what happened, all I know is I just heard a big boom and had a crash." The trooper concluded from all the evidence, including the existence of a clear day with three-fourths of a mile visibility west of the point of impact, that Martin was "apparently sleepy" before the collision, implying that he had dozed off as he approached the Lee Way truck.

This action was filed by the occupants of the Lee Way truck and their wives against Martin, Ellex and its insurance carrier. Lee Way got permission to intervene in the lawsuit to recoup its damages, which consisted of $10,289 truck damage, $6,893 medical expenses incurred by its drivers and $25,313 paid as workers' compensation to plaintiffs. After seven days of trial the

case was submitted to the jury and it returned the verdict we summarized earlier.

Plaintiffs appeal contending it was reversibly erroneous for the trial court to (1) instruct on contributory negligence; (2) refuse to instruct on the collateral source doctrine; (3) deny a new trial in the face of an inconsistent jury verdict; (4) refuse to instruct on the absent document presumption; (5) admit the deposition of a Dr. Metcalf; (6) exclude all evidence relating to percentage of impairment; (7) instruct on the theory of "sudden emergency;" and (8) refuse to direct a verdict for the plaintiffs on the liability issue.

## II

The first issue raised—that the court should not have instructed on contributory negligence—has merit.

The primary fact regarding the collision, namely, that defendant Ellex's truck ran into the rear-end of Lee Way's truck on a clear, dry and open highway at a high rate of speed, is not disputed. The question then is, is there any evidence that plaintiff Witt did anything that could be said to be a breach of duty owed to defendants that contributed to the cause of the wreck?

Defendants' response to this question refers us to certain testimony of defendant Martin and of the investigating officer. Specifically, they point to testimony elicited during cross-examination by plaintiffs' counsel.

"Now, tell us how the accident occurred, Mr. Martin," said counsel.

"Well, I just [sic] going down the highway there, I was doing about fifty-five, sixty, I guess. I was kinda watching traffic behind me and everything and this car was passing me and I don't know, the next thing I looked up and there was that truck right there in front of me and looked like he was pulling off the shoulder onto the road."

However, further cross-examination drew an admission from Martin that he never saw the Lee Way truck on the shoulder.

"Mr. Martin, let's get it straight once and for all. Where do you say that the Lee Way truck was the first time that you saw it?"

"The first time I realized it was in front of me. It was right in front of me on the highway ... with the right rear tandem trailer wheels still—you know where the cement and the blacktop—"

Martin went on to say that the truck was "headed pretty straight" and he did not know where it had been before that.

"And you don't know," Martin was asked, "that he was ever on the shoulder, other than those two tires?"

"No, I just assumed, you know, pulling on the highway part of your wheels are going to be off of it."

Clearly Martin's testimony is not sufficient to support a finding that the Lee Way truck had ever been on the shoulder more than the width of the rear duals, or that it had suddenly pulled off the shoulder into Martin's path.

The other testimony relied on by defendants to establish contributory negligence is that of the trooper who defendants say "testified that it was possible that Plaintiffs' truck pulled out in front of the Defendant." The basis for this is the following question:

"Well, assume that there will [be] evidence in this case that it's Mr. Martin's *position* that this truck came off the shoulder in front of him, I think you did previously say, did you not, that it could have happened that way if the truck had gotten up more speed on the shoulder?" [1]

"Could have," answered the officer.

■ The key word in the hypothetical question is "position." A hypothetical question must consist of hypothetical facts. Theories or partisan positions furnish no foundation for an expert's opinion. In this case the expert would have had to respond with the same answer if he was told to assume that it was defendant's position that

---

1. Emphasis added.

the Lee Way truck suddenly started traveling backwards shortly before it was struck or that it suddenly stopped without warning. Such response has no probative value.

The fact remains that there was no evidence to support any such theory or "position." The physical evidence at the scene, according to the officer, contradicted any notion that the Lee Way truck pulled off the shoulder in front of the Ellex truck.

■ It is our conclusion that all the hard and circumstantial evidence recorded here was insufficient to support an inference that the Lee Way driver violated any duty whatsoever. Under such circumstances the issue of contributory negligence should not have been submitted to the jury. *Denco Bus Lines, Inc. v. Rose,* 203 Okl. 466, 224 P.2d 260 (1950); *Burgess v. Friedman & Son, Inc.,* Okl.App., 637 P.2d 908 (1981).

### III

The same is true of the so-called defense of "sudden emergency" which the court instructed on. There is no evidence that Martin was suddenly confronted with an emergency which was not created by his own negligence.

### IV

Plaintiffs' second assignment of error is that the plaintiffs were prejudiced by the court's refusal to instruct the jury that defendants were *not* entitled to credit for the workers' compensation benefits received by intervenor.

■ We agree. Ordinarily the instruction should not be given, but here it should have been. Workers' compensation is a collateral source and may not be considered to lessen the damages recoverable from the injury-causing tortfeasor. The compensation act benefits consisted of payments made for both medical treatment and disability.

■ Among the circumstances calling for the requested instruction was the limine discussion of what role Lee Way and the compensation benefits would play at the trial.[2] As mentioned by the trial court early in the conference the best way to handle the matter would have been to keep the compensation award out of the case altogether. Normally this is the way it is handled. Here, however, plaintiffs did not want to go that way because they thought it more of an advantage to show the extent of disability found by the workers' compensation court. Ellex and Martin, on the other hand, could see an advantage in showing that plaintiffs had already recovered what one court thought they were entitled to, but objected strenuously to the mention of any percentage of permanent disability found by the workers' compensation court.

Following a lengthy discussion the trial court decided to let the whole thing go in except the percentage of disability factor. Given this format it became important to inform the jury that they were not to consider the workers' compensation recovery as reducing the damages plaintiffs were entitled to. Since no award was made by the jury to either plaintiff, it is likely the jury failed to do so because of thinking the amount awarded by the workers' court was what the judge of that court found to be their full common law damage entitlement. Indeed, defendants' success in keeping disability percentage testimony out placed them in a position to encourage just such thinking in closing argument.

"If you do decide that it's Ellex's driver's fault," defense counsel said to the jury, "then you have to decide what are these people entitled to, if anything, over and above what they've already gotten." At another point the lawyer said to the jury, "And, finally have they [plaintiffs] already been paid too much, not enough or just the right amount." With regard to plaintiff Witt the lawyer said, "His medical bills have been paid and in addition to that this

---

**2.** The subject was raised by defendants' motion in limine. We might mention that the term "limine" is derived from the latin word "limen" which means threshold. Use of such motion is not restricted to excluding information though it is most often used for such purpose, but may involve the admission of evidence.

is how much he has received from the Workman's Compensation." Finally counsel suggested the jury "give Lee Way back what they [sic] paid ... then say to Mr. Booth and Mr. Witt that is enough. You have already gotten your bills paid and you've already gotten compensation. We're not going to penalize Lee Way for having to live with the law. You have the power to write zero dollars on that verdict for Mr. Witt and Mr. Booth if you think they've already gotten enough."

It has long been the rule in this jurisdiction that collateral payment sources are not to be considered as reducing the damages caused by the responsible tortfeasors. *Keispert v. Williams,* Okl., 333 P.2d 514 (1958). Had the requested instruction been given it may have at least prevented defendants' improper argument. Whatever else may be said about the procedure followed in this case, the problems it generated clearly demonstrate, it seems to us, that the best way to avoid them is to keep evidence of workers' compensation payments out of the lawsuit. After all it is inadmissible. *Burk Royalty Co. v. Jacobs,* Okl., 387 P.2d 638 (1963).

### V

■ Plaintiffs' third contention is that the verdict is inconsistent, entitling them to a new trial on damages. The argument is that defendants were found to be at least 65 percent at fault and the jury awarded Lee Way damages reimbursing it for over $6,000 in medical expenses which the jury found were reasonable and necessarily incurred for treating plaintiffs' injuries and for over $25,000 compensation paid for permanent partial disability which the jury also found was "reasonable and necessary," and yet awarded plaintiffs nothing for pain or other injury related detriment.

The problem here arises from a factual situation similar to, but a little different from, two earlier cases dealing with inconsistent verdicts—*Burkett v. Moran,* Okl., 410 P.2d 876 (1965), and *Hallford v. Schumacher,* Okl., 323 P.2d 989 (1958). We think, however, in essential effect, the foundational facts disclose a result calling for application of the *Burkett* rationale. The main factual difference is that in *Burkett* the jury found defendant was liable and awarded plaintiff the cost of his car repair, his medical expenses in the sum of $2,065.51 and $450 for one month's salary. The court, citing *Hallford* as precedent, concluded that the verdict was substantively defective in that it was inconsistent, entitling plaintiff to a new trial because under the "uncontradicted evidence, if defendant was liable to plaintiff at all, plaintiff was entitled to recover damages from past pain and suffering."

The factual distinction here, of course, is that plaintiffs' medical expenses and the disability compensation they had received from their employer was awarded to a third party instead of plaintiffs. It is one without a significant difference. The essential fact is that in making the Lee Way award the jury instructionally had to find that it was necessary for plaintiffs to undergo substantial medical treatment and that the compensation court awards for disability secondary to the collision were reasonable and proper. In other words, even though the finding was in connection with the Lee Way judgment the effect was that the jury had to find that both plaintiffs were injured in the wreck, had suffered pain and had some consequential residual disability. The effect of the verdict was to award significant medical expenses and award nothing for any pain or other injury related detriment. It was indeed inconsistent.

As we mentioned earlier, one of the likely reasons for the verdict was the court's failure to properly instruct on the collateral source doctrine, coupled with defendants' improper argument. There is another factor that may have had some bearing on the problem, which ironically was created by an instruction requested by plaintiffs, and that is the unusual nature of the damage instruction. First, it starts out with an unnecessary and inappropriate argument that the "fact that an instruction is given on the subject of damages is not to be interpreted ... as an indication that the court has

concluded that the plaintiffs are entitled to recover...." Second, the instruction said that if the jury "found in favor of plaintiffs, then you *may* assess damages in such amount as has been established by a preponderance of the evidence ...."[3] They should have been told they "must" award an appropriate amount of damages. Third, the jury was told that "in determining the amount of damages which will compensate plaintiffs ... you may take into consideration the plaintiffs' ages, their life expectancy, their physical and mental conditions immediately before and after the accident, the nature and extent of the injuries resulting from this accident, if any, the permanent disability, if any, and the pain and suffering endured and likely to be endured in the future ... if any." Aside from the fact this language has little practical meaningfulness, the instruction fails to identify the various elements of detriment which the trial court found to be supported by evidence, nor does it tell the jury that it must award damages for each of such elements it finds has been factually established by a preponderance of the evidence. Fourth, the instruction features a second ambiguous argument about recovery for aggravation of pre-existing conditions to the effect that "defendants cannot invoke the previous condition of the plaintiff for the purpose of escaping the consequences of their own acts. However, there can be no recovery for an injury which was not proximately caused by and which in no way resulted from the accident ... nor can there be any recovery for a pre-existing condition or disability which was in no way aggravated by the accident...."

We mention this in the hope that should there be a second trial the court will use a modified version of Oklahoma Uniform Jury Instruction, Civil No. 4.1. Such modification should meet the implied requirements of *Burkett* and *Hallford.*

## VI

■ Plaintiffs' next point of error is that they were prejudiced by the court's failure to instruct the jury that defendants' failure to produce a requested document gives rise to a presumption that the document contained facts unfavorable to defendants.

The failure to produce presumption has been judicially recognized for many years. *Harrison v. Reed,* 154 Okl. 39, 6 P.2d 700 (1931); *Moore v. Adams,* 26 Okl. 48, 108 P. 392 (1910). More recently it was alluded to in *Rogers v. Cato Oil & Grease Co.,* Okl., 396 P.2d 1000 (1964). The recommendation of OUJI—Civil 3.11, is that no instruction on the inference arising from failure to produce evidence or a witness should be given. The main reason is that the matter is a subject for argument to the jury and should not be given undue recognition by the court. The trial court correctly rejected the requested instruction.

## VII

■ Plaintiffs' fifth contention is that the deposition of a physician used to aid plaintiffs in obtaining workers' compensation should not have been admitted into evidence and that its admission was prejudicial.

The physician in question was J. Dan Metcalf, M.D. He had earlier examined plaintiffs and had rendered reports which became evidence in the compensation cases. His deposition was taken by plaintiffs but he was not summoned as a witness by either party. Defendants were allowed over the objection of plaintiffs and intervenor to read carefully selected portions of the Metcalf deposition thereby laying the foundation for the strange and unusual developments that begat the error assigned.

Foreshadowing the ultimate problem was an improper question put by defendants during cross-examination of plaintiff Booth. Metcalf had not testified in the case and in fact had not even been listed as a witness for plaintiffs. After establishing that Booth was seen by Metcalf in connection with a workers' compensation claim defendants' counsel suddenly asked, "Were you aware that Dr. Metcalf's license to practice

---

**3.** Emphasis supplied.

medicine had been suspended for a period of sixty days—"

"Just a minute, Your Honor," interrupted plaintiffs' lawyer.

"—were you aware of that?" pressed the examiner.

"No, sir," answered the witness.

Plaintiffs' counsel asked for a bench conference during which he pointed out the irrelevance of the "did you know" type elicitation and requested that the jury be told so.

The trial judge correctly ruled that whether the witness had such information was irrelevant.

"It goes to the credibility," said defense counsel.

"Of what?" asked the court.

"Of his going to see these doctors and what his complaints are and whether it was for workers' compensation," responded the lawyer.

Whereupon the court sustained the objection and told the jury to try to put out of their minds the "answer having to do with Dr. Metcalf's being temporarily suspended. That doesn't have anything to do with this lawsuit."

But defense counsel was persistent. "Your Honor, I'm going to offer his deposition and it goes to his qualifications."

"Well," said the court, "I don't know how you're going to impeach your own witness."

"I'm entitled to impeach any witness—"

"Well, at that time it may be appropriate, but at this time it is not and you're instructed ladies and gentlemen to ignore it."

Eventually plaintiffs rested without having put Metcalf on as a witness.

During the ensuing recess defendants complied with the court's request to offer the Metcalf deposition in chambers. Earlier, when the deposition was taken, the parties stipulated that it could "be read at trial without regard to any statutory showing." It was further stipulated that all objections to the questions asked, except as to form and answers given, could be made at trial.

"I'm offering portions of this deposition.... Dr. Metcalf was listed as a witness by ourselves back in March of 1980," said defense counsel.

"Under this catch all—" asked the court, referring to a defense witness list that did not mention Metcalf but merely referred to "any medical doctor who has seen or treated any of the plaintiffs—"

"Yes, sir."

After pointing out the deposition's lack of relevance to any issue raised by the defense, the intervenor mentioned that even the issue of reasonableness of the medical bills it paid was not raised by the pleadings.

"For what other purpose can you conceivably [be] offering Dr. Metcalf's testimony?" asked the court.

"Your Honor ... so far as it goes to the motive or intent of these men to remain off work—frankly, if you give me a couple of hours I could probably come up with a lot of reasons...."

Nevertheless, over objections of plaintiffs and intervenors, the court ultimately allowed defendants to read portions of the deposition and here is what they read.

First defendants covered a series of qualification answers which disclosed that the witness received an M.D. certificate from the University of Oklahoma in 1966, interned in an Oklahoma City hospital in 1967 and since then practiced medicine in Oklahoma City with emphasis on industrial and sports medicine. This subject ended with an acknowledgment that the expert saw plaintiff Witt for an evaluation at the request of plaintiffs' lawyer.

The defense next turned to what he described as "Cross-examination by myself" on page 15. Plaintiffs again objected. There was no ruling. This second series opened with defense counsel getting permission to look at the witness's records with regard to plaintiff Witt. Then came questions concerning the historical data contained in the records which, among other things, brought to the jury's attention "an information sheet on an accident that he

[Witt] was involved in in November of 1976 ... regarding an injury to the right elbow" and "also to the left leg ...." Counsel developed that a compensation claim was filed for the 1976 injuries and that the witness found that Witt had sustained some permanent disability to the leg and arm. This deposition segment ended with the witness agreeing with a profound observation of defense counsel that the opinions of physicians commonly differ with regard to a claimant's disability.

The third group of depositional questions disclosed that the witness saw plaintiff Witt some two months following the July 1978 wreck, the subject of this action, at the request of his lawyer and that his only treatment was the giving of some muscle relaxant and pain medication following an examination.

The next part read by defense counsel concerned whether Metcalf had evaluated plaintiff Witt's condition growing out of an earlier accident (1976) for workers' compensation purposes and whether he had received a history that Witt "had sustained a low back injury back in 1976."

The last series of questions featured a number of "isn't it a fact" type questions aimed at establishing that the witness had a conflict with the Board of Examiners in 1978 resulting in a 60 day suspension of his medical license—a decision that was stayed on appeal to the supreme court; that he was ordered not to prescribe Schedule II drugs to certain patients prior to January 1980; that the federal authorities said he could; that he has to file duplicate prescriptions with the board; that Mercy Hospital withdrew his staff privileges several years ago; and that he never applied for staff privileges at two or three other hospitals and had resigned at another hospital. The witness was asked about his patient load, his last surgery, whether he saw a lot of workers' compensation claimants, and whether he saw plaintiff Booth for an eval-

uation in connection with the workers' compensation claim.

This offering of prejudicial irrelevancies should have been rejected. Evidence which is not relevant is not admissible.[4] Even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of, among other things, unfair prejudice.[5] But the "evidence" was not legally relevant because it lacked the essential quality of having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.[6] Or to put it in the positive, "evidence is relevant if it legally tends to prove some matter in issue or tends to make a proposition in issue more or less probable...."[7]

To properly analyze the situation and place it in proper perspective we have to start with basics. The issues in the case, as between plaintiffs and defendants, fall under two main headings: (1) tort liability of defendants and (2) nature and extent of causally connected injuries.

Defendants do not pretend that their professed "impeachment" of Metcalf was directed toward any fault issue but say in their brief that their "basic position throughout the trial, from voir dire to verdict, was that plaintiffs' claims were exaggerated. The impeachment of Dr. Metcalf substantiated and corroborated this position." Such "impeachment," defendants say, is ordained by 12 O.S.1981 § 2607, which authorizes any party to attack the credibility of a witness, including the party calling him. They also point to *Bewley v. State,* Okl.Cr., 404 P.2d 39 (1965), as a basis for the suggestion that the "scope of impeachment" includes cross-examination as to collateral matters not embraced in the direct examination to test believability or veracity.

**4.** 12 O.S.1981 § 2402.

**5.** 12 O.S.1981 § 2403.

**6.** 12 O.S.1981 § 2401.

**7.** *Short v. Unsell,* Okl., 497 P.2d 1060 (1972); *Iven v. Roder,* Okl., 431 P.2d 321 (1967).

What defendants overlook, however, is that both the statute and case law they cite contemplate the impeachment of a witness who has predicationally imparted relevant information which, if believed, has a probative impact on some issue being tried. As used in context of a witness, the term "impeach" means to cast doubt on his reliability or credibility as a purveyor of relevant information. It is absurd to suggest that § 2607 is intended to authorize a litigant to put a witness on the stand for the sole purpose of attacking his credibility or, as was done here, getting to the jury a lot of prejudicial irrelevancies under the guise of impeachment.

So the question is, did defendants read anything from the Metcalf deposition that was relevant to the issue of the nature and extent of plaintiffs' injuries. Bearing in mind that defendants want, and are entitled, to present probative evidence that tends to show that plaintiffs were not injured as seriously as they claim, here is what defendants say "an objective view of the portions read [will] show ..." was clearly relevant: (1) "Dr. Metcalf's qualifications;" (2) "Dr. Metcalf's treatment of Mr. Witt for a previous injury;" (3) "Dr. Metcalf's examination of Mr. Witt for his present injuries, at the request of Mr. Lampkin;" (4) "Dr. Metcalf's prescription for and treatment of Mr. Witt;" and (5) "Dr. Metcalf's unawareness of Mr. Witt's prior injuries."

The qualifications of Metcalf to testify as a medical expert, standing alone, could have no earthly bearing on the nature or extent of plaintiffs' injuries.

Neither could the second thing listed by defendants. Besides being a misstatement of the record, the transcript reference given by defendants (Tr. at 524–5) contains no statement or implication that Metcalf treated Witt for any previous injury. All the physician did was examine Witt sometime after a 1976 accident and found he had sustained injury to his right elbow and left leg—an act and finding that shed no light on the injuries arising from the 1978 wreck.

The third item offered by defendants as "relevant" evidence—Metcalf's examination of Witt after the 1978 injuries were sustained—is likewise specious. The fact that such an examination took place simply has no more to do with proving the nature and extent of Witt's injuries than if he had been examined by Ben Casey.

The fourth item is another misinterpretation of the record. The specific testimony referred to consists of the following cross-examination. Defense counsel asked Metcalf, "And you never did treat him, did you?"

"I gave him medication," the physician answered.

"What medication did you give him?"

"Muscle relaxants and pain medication."

"Would you show me where there's a notation to that effect?" the defense lawyer asked, referring to Metcalf's office record.

"Right here. That's 'P. Forte.' That means Parafon Forte, which is a muscle relaxant, pain medication."

"Is that all you did for him?"

"Yes."

"You didn't hospitalize him?"

"No, sir."

"You didn't give him any physical therapy?"

"No, sir."

Five or six questions later the defense attorney asked with reference to the 1976 and 1978 accidents, "And the only purpose for your seeing him [Witt] was to write a report for the Industrial Court, right?"

"To evaluate the injuries to his right arm and his left leg for the State Industrial Court, yes."

"And that was done at the request of his lawyers?"

"Yes, that's correct."

The foregoing testimony was not to prove Metcalf had treated Witt but to show the very opposite—that he had examined Witt for the "lawyer's use" in the Workers' Compensation Court. No medication was "prescribed" and the capsules were given Witt

following the examination—a disclosure that came as a surprise to counsel. Assuming that handing the pills to Witt rose to the dignity of "treatment," the ultimate fact remains that such evidence in no wise tended to prove the nature and extent of subject injuries.

Finally the last bit of evidence defendants suggest is relevant is "Dr. Metcalf's unawareness of Mr. Witt's prior injuries." It seems to us that to merely recite the statement is to expose it as sophistry. Given the complete absence of any injury related substantive testimony by Metcalf regarding the nature and extent of Witt's injuries, the witness's degree of awareness or unawareness was as irrelevant as what Marcus Welby was unaware of.

Clearly, defendants' strategy was not to offer witness Metcalf to establish some part of their defense, but as a subterfuge to dump verbal garbage on plaintiffs. As we have seen, they could not, under the circumstances, impeach Metcalf, and so they boldly presented collateral matters in such a manner as to create maximal anti-plaintiff prejudice. The spurious deposition offering should have been rejected.[8]

## VIII

Another assignment of error which should be discussed is the trial court's rejection of expert testimony expressing plaintiffs' disability in terms of percentages.

This problem was an outgrowth of defendants' limine motion to exclude "percentages of disability found by the [Workers' Compensation] court." After consider-

able debate defense counsel went even further and said "I don't think expert witnesses ought to be testifying the [sic] percentage."

The court sustained the motion. The complaint is that this ruling seriously hampered plaintiffs' effort to bring out percentage of disability testimony from their physicians.

■ No rule of law forbids a medical expert witness to express an opinion regarding the percentage of disability a party has sustained. Admittedly percentage testimony is not common in personal injury actions, but the reason is related to strategy rather than inadmissibility.

Here counsel for plaintiffs agreed to the exclusion of the percentages "found" by the workers' court but not to percentage testimony by their physicians. Just what testimony was offered, however, is not clear because a good deal of plaintiffs' medical evidence was by video deposition—to which we have no access. We doubt that this problem will again arise in the event of a second trial.

## IX

Finally plaintiffs say the court should have directed a verdict in their favor on the liability issue.

In view of what we have said with regard to the defendants' defenses we anticipate the trial court will properly rule on such a motion if the occasion arises later on.

8. *Smith v. Missouri, K. & T. Ry.*, 76 Okl. 303, 185 P. 70 (1918). There, specialists called by plaintiff to testify as to the character and duration of his injury, were, over the objection of plaintiff, improperly cross-examined about the fact that plaintiff may have received incorrect treatment at the hands of the first doctor he went to after the train related accident in question. In granting a new trial the court said: "This character of cross-examination was not permissible for two reasons: (1) Because it was irrelevant, and tended to support an issue not raised by the pleadings and not submitted to the jury for determination. (2) Because it extended beyond the direct examination of the witnesses." And, added the court, it "is no answer to this assignment to say that this line of cross-examination was permissible to determine the competency of the expert witnesses, and to test their knowledge and skill, and that its tendency was merely to reduce the amount of the plaintiff's recovery, and since the plaintiff did not recover anything by the verdict of the jury, the error, if any, was harmless...." Such cross-examination "tended to introduce in the case collateral issues and ... had a direct tendency to confuse the minds of the jury and to obscure the issues submitted for trial ... and to direct their attention ... to whether or not the plaintiff had competent physicians ...."

X

The judgment as to defendants James Martin, Ellex Transportation and Excalibur Insurance Company is reversed and the cause is remanded for a new trial.

DeMIER and STUBBLEFIELD, J., concur.